Matthias, J.
Respondent’s objections to the report and recommendation of the Board of Commissioners on Grievances and Discipline raise essentially three issues for our determination:
I. Whether this Court has jurisdiction to discipline an attorney who is a judge for acts committed in his judicial capacity which are in violation of the Canons of Judicial Ethics adopted by and made a rule of this court prior to the commission of such acts.
II. Whether the facts in the instant case justify a finding that such Canons of Judicial Ethics have been violated.
III. Whether the measure of discipline recommended by the board of commissioners is commensurate with such violation or violations, if such are found to exist.
Respondent, also questions the constitutionality of Rule XXVII of the Supreme Court of Ohio, on the grounds that “it violates due process in that it does not guarantee * * * [him] a hearing before this court,” that “it is at variance with statutory procedure,” and that “it deprives the Court of Common Pleas and Court of Appeals jurisdiction over disbarment proceedings, which jurisdiction is vested in said courts by the General Assembly.”
With respect to “due process,” the fact that respondent had a hearing before this court precludes him from questioning the constitutionality of a rule which has not operated unconstitutionally upon him. In this respect, the law applied by this court to statutes applies with equal force to the rule of court hero under consideration. That law is set out in the first and second paragraphs of the syllabus of State, ex rel Herbert, v. Ferguson, Aud., 142 Ohio St., 496, 52 N. E. (2d), 980.
The latter two contentions with respect to constitutionality were argued extensively, considered, and rejected by this court in Cleveland Bar Association v. Pleasant, supra (167 Ohio St., 325).
In considering the first of the above-stated issues to be determined herein, our research has disclosed many instances wherein courts throughout the nation have dealt, or attempted to deal, with alleged misconduct of judges. The results of such actions have been diversified and varied. See annotation, 53 *20 A. L. R. (2d), 303, and the cases cited therein. Our research has failed, however, to disclose any instance wherein the highest appellate court of any state has dealt directly with the question at hand in a setting such as we have in Ohio, that is, where such court has provided by rule a comprehensive procedure to activate its inherent duty and to implement its inherent power with respect to supervising the disciplining of all members of the legal profession in the state.
In this respect, however, see In re Copland, 66 Ohio App., 304, 33 N. E. (2d), 857, wherein the Court of Appeals for Cuyahoga County sustained the disbarment by the Common Pleas Court of Cuyahoga County of one David Copland, who, at the time of the action, was a judge of the Municipal Court. Copland was charged with writing and causing to be published in a legal journal an opinion in a fictitious cause purporting to have been heard and decided by him, and with the giving of false answers concerning his background and education in a campaign questionnaire sent him by the Cleveland Bar Association.
Copland readily admitted both charges but argued that the acts stated therein did not subject him to discipline since they were not committed “in office,” that is, as an attorney at law, but were acts committed in his capacity as Judge of the Municipal Court. However, in' sustaining the judgment of disbarment rendered by the Common Pleas Court on the above facts, the Court of Appeals said:
“We perceive no special sanctity which should surround the unofficial acts of a judge. It is not the personal habits of a judge that are complained of with respect to his judgeship, but his act done as a member of the Bar under color of his other office which he holds for the time being.” (Emphasis added.)
Thus, even though Copland’s acts were found to have been committed outside his capacity as a judge, the disbarment of a judge for ethical reasons is not entirely new to the state, although it is new to this court.
In considering the jurisdiction of this court to discipline an attorney who is a judge for acts committed in his judicial capacity and which are in violation of the Canons of Judicial Ethics adopted by and made a rule of this court, we must keep in mind the basic facts and premises upon which our conclusion wall rest.
*21 1. “The Supreme Court of Ohio has inherent jurisdiction of proceedings to disbar an attorney, resulting as an incident of its organization as a court, as well as from its power to admit to the bar.” Paragraph one of the syllabus of In re Thatcher, 80 Ohio St., 492, 89 N. E., 39. “The Supreme Court of Ohio has inherent power as to the disciplining of attorneys admitted to practice in this state and may provide by rule the procedure with reference to such disciplining.” Paragraph one of the syllabus of Cleveland Bar Association v. Pleasant, supra.
2. In 1952, the Supreme Court of Ohio adopted the Canons of Professional Ethics which it declared “shall be binding upon all members admitted to practice law in the state of Ohio, and the wilful breach thereof shall be punished by reprimand, by suspension or by disbarment.” See Rule XXVIII, Rules of Practice of the Supreme Court of Ohio.
3. In 1954, the Supreme Court of Ohio amended and adopted the Canons of Judicial Ethics which it also declared “shall be binding upon all members admitted to practice law in the state of Ohio, and the wilful breach thereof shall be punished by reprimand, by suspension or by disbarment.” See Rule XXVIII, Rules of Practice of the Supreme Court of Ohio.
4. In 1956, the Supreme Court of Ohio amended Rule XXVII, effective January 1, 1957, to provide a comprehensive procedure to activate the inherent duty and to implement the inherent power of that court to supervise the disciplining of all members of the legal profession of the state.
Rule XXVII, Section 1, as amended, empowers the Board of Commissioners on Grievances and Discipline, created therein, to act “(a) concerning complaints of misconduct as hereinafter defined [in Section 5] which are alleged to have been committed by any attorney or counselor at law or judge, or (b) concerning practices of any attorney and counselor at law or judge, which tend to defeat the administration of justice or to bring the courts or the legal profession into disrepute.”
Rule XXVII, Section 5, as amended, provides that “misconduct,, as the term is used herein, shall mean any violation of any provision of the oath of office taken upon admission to [the] practice of law in this state, or any violation of the Canons of Professional Ethics or the Canons of Judicial Ethics as adopted *22 by the court from time to time, or the commission or conviction of a crime involving moral turpitude.”
Rule XXVII, Section 6, as amended, provides:
“Each attorney and counselor at law or judge found guilty of misconduct shall be disciplined. The discipline of such persons shall be
“ (a) a permanent disbarment from the practice of law, or
“(b) suspension for an indefinite period from the practice of law subject only to reinstatement as hereinafter provided, or '
“(c) a public reprimand, or
“(d) a private reprimand.” (Emphasis added.)
5. The General Assembly has declared that, as a prerequisite to serving as a judge of any court in the state of Ohio, a person must be an attorney who has been admitted to the practice of law in Ohio for a specified number of years. See Sections 2503.01 (judges of the Supreme Court), 2501.02 (judges of Courts of Appeals), 2301.01 (judges of Common Pleas Courts), 2101.02 (judges of Probate Courts), 1901.06 (judges of Municipal Courts) and 1907.051 (judges of County Courts), Revised Code. The fact that this requirement is not effective until 1963 with respect to judges of County Courts does not detract in the least from the clear intent of the General Assembly that, as soon as possible, every judge in this state shall have been admitted to the practice of law for a specified number of years in order to be eligible to hold such office.
So much has been said and written about the honor, dignity, duties, responsibilities and standard of conduct generally expected of the legal profession that to expound thereon here would only be to repeat that which has already been well said many times. The fact remains, however, that a person who attains the honor and dignity of being a member of the legal profession necessarily renders himself subject to the duties and responsibilities thereof, i. e., one who is admitted to the practice of law in Ohio by meeting the character and educational requirements prescribed by the rules of this court must, in order to continue the practice of law in this state, meet and maintain the standard of ethical conduct which is also prescribed by the rules of this court. The Supreme Court of Ohio, a part of the “judicial branch” of the governmental structure of Ohio, demands that persons admitted to the practice of law in this state *23 must maintain a high degree of integrity and an exceptionally high standard of conduct. This court is not hesitant to discipline persons admitted to the practice of law who fail or refuse to maintain such standards. It follows that those outside the “judicial branch” of our governmental structure also have a right to expect much in the way of integrity and the maintenance of an exceptionally high standard of conduct from one who has been admitted to the practice of law by this court.
It is for this reason that the requirement by the “legislative branch” of our government that all judges of the state shall be attorneys who have been admitted to the practice of law for a specified number of years can lead only to the conclusion that the General Assembly demands that the judges of the state shall not only have met the standards of character and knowledge of the law required by this court for admittance to the practice of law, but that they shall also have maintained, for a specified number of years, and must continue to maintain the high ethical standard of conduct required by this court. It follows that the requirement by the Supreme Court of Ohio that attorneys who are judges shall adhere to a specialized code of ethics, i. e., the Canons of Judicial Ethics, is in accord with the legislative intent that the judges of this state shall be persons who must adhere to the highest possible standard of ethical conduct.
In addition, it is fundamental that the legal profession of Ohio includes every person who has been admitted to the practice of law therein, by and under the rules for admittance thereto as adopted by this court, whose name is maintained on the Journal and Roll of Attorneys kept by this court, regardless of the subsequent capacity or status of such person, be he banker, farmer, businessman or judge. Stated more simply, the legal profession of Ohio includes every person who has the privilege, granted by this court, to represent himself to the public as an attorney at law and to appear in a representative capacity before the courts of this state. It is the privilege to practice law before the courts of Ohio which is determinative of one’s status as a member of the legal profession of this state, rather than the exercise of such privilege. It follows, of course, that one who does not have the privilége to practice law in this state is not a member of the legal profession thereof.
Since a judge is required by statute to be an attorney at *24 law, it is clear that he must necessarily maintain his privilege to practice law, L e., his membership in the legal profession, even though ethical standards or the public interest may require a temporary limitation on or suspension of his ability to exercise such privilege without resigning his judicial office.
We conclude, with respect to the first issue presented, that since an attorney at law does not, upon assuming a judicial position, cease to be a member of the legal profession, but becomes such a member who has assumed a position of public trust which demands of him an even greater degree of responsibility and an even higher and more specialized standard of conduct than that demanded of a practicing attorney, this court, through its inherent power and duty to maintain the honor and dignity of tiie legal profession of Ohio at its traditionally high level, may prescribe a specialized standard of conduct for all members of such profession who hold judicial office and has jurisdiction over the discipline of such a member for acts committed'in his judicial capacity which are in violation of the Canons of Judicial Ethics adopted by and made a rule of this court prior to the commission of such acts.
We will next consider the second issue presented by respondent’s objections.
It is clear from the undisputed facts that respondent did wilfully and knowingly violate Canon 30 of the Canons of Judicial Ethics adopted by this court in 1954. That canon specifically provides that, “if a judge should decide to become a candidate for any office not judicial, he should resign in order that it cannot be said that he is using the power or prestige of his judicial position to promote his own candidacy or the success of his party.”
Respondent argues that there could be no violation of Canon 30, since that canon conflicts with the law of Ohio as set forth by this court in Fulton v. Smith, 99 Ohio St., 230, 124 N. E., 188, and is, therefore, unenforcible.
. In the Fulton case, this court decided that, since Section 14, Article IV of the Constitution of Ohio, provides only that votes cast for Common Pleas Court and Supreme Court judges for other than judicial offices shall not be counted, the General Assembly may not enlarge upon that prohibition in providing *25 by statute that votes cast for probate judges for nonjudicial offices shall not be counted.
It is at once apparent that a finding by this court regarding the power of the General Assembly to enlarge upon a prohibition imposed by the Constitution is in no way connected with the power of this court to impose certain standards of conduct upon all members of the legal profession of this state as conditions to the maintenance of their status as such members.
Section 14, Article IV of the Constitution, was enacted in 1851, many years before the General Assembly, in 1917, first saw fit to require that a candidate for judicial office must be an attorney at law. It applies to the disposition of votes cast in an election — a subject which is political in nature and concerning which this, court admittedly has no power to make rules. It became effective long before the first set of nationally recognized Canons of Judicial Ethics (those adopted by the American Bar Association in 1924) was promulgated.
It is our conclusion regarding this issue that the Fulton case involved solely a ruling by this court on the validity of a statute considered in relation to a constitutional provision, and that that case has no application whatsoever to the question before us. The fact that respondent relied on that case in arriving at his decision to disregard Canon 30 helps explain his reason for such disregard but does not excuse the fact that he intentionally and wilfully violated a rule duly adopted by this court, to which ho was subject by virtue of his status as a member of the legal profession.
We come now to the last and perhaps most difficult issue raised, i. e., whether the discipline of suspension, recommended by the board of commissioners, is commensurate with the violation found.
Canon 30 of the Canons of Judicial Ethics, as adopted by and made a rule of this court, provides:
“A candidate for judicial position should not make or suffer others to make for him promises of conduct in office which appeal to the cupidity or prejudices of the appointing or electing power; he should not announce in advance his conclusions of law on disputed issues to secure class support, and he should do nothing while a candidate to create the impression that if *26 chosen, he will administer his office with bias, partiality or improper discrimination.
“While holding a judicial position he should not become an active candidate either at a party primary or at a general election for any office other than a judicial office. If a judge should decide to become a candidate for any office not judicial, he should resign m order that it ca,nnot be said that he is using the power or prestige of his judicial position to promote his own candidacy or the success of his party.
“If a judge becomes a candidate for any judicial office, he should refrain from all conduct which might tend to arouse reasonable suspicion that he is using the power of his judicial position to promote his candidacy or the success of his party.
“He should not permit others to do anything in behalf of his candidacy which would reasonably lead to such suspicion.” (Emphasis added.)
The emphasized portions of that canon clearly indicate the reason for the restrictions therein on partisan political activities by members of the judiciary. The purpose of such restrictions is to keep judges ever mindful that, even though they may have been nominated in a partisan,primary and may have been connected to some extent with partisan politics during their campaign for election (though elected on a-nonpartisan ballot), once elected to the judiciary they have- assumed an office of public trust which must remain outside and distinct from the “mainstream” of partisan politics in order to maintain the independence, impartiality and freedom from bias, prejudice and pressure, which the people have a right to expect -from their judges. .- r.
It is thus apparent that the requirements of Canon 30 that a judge who becomes a candidate for- a nonjudicial office shall resign his judicial position and that a judge who is a candidate for a judicial office must exercise caution in engaging in partisan activities are not merely arbitrary rules of conduct laid down by this court, but are requirements bottomed on the premise that the judiciary of the state of Ohio shall be kept as far as possible from the “mainstream” of partisan politics, all things considered, and that the resignation of a judge who becomes a *27 .candidate for a nonjudicial office is a reasonable measure designed to preclude the possibility of the intrusion of partisan polities into the administration of justice and to preclude even the suspicion of such intrusion, which would normally attach to every ruling a judge who retains the bench while a candidate for a nonjudicial office might make, regardless of his intent or the soundness or justice of such ruling.
The respondent herein did not resign his judicial position while a candidate for prosecuting attorney. Although this fact standing alone might not warrant the discipline of suspension, we must look further and determine whether he not only committed a breach of Canon 30 by his failure to resign, but whether his offense was more serious in that he did in fact use the power and prestige of his judicial position to further his candidacy for a nonjudicial office.
A clear picture of respondent’s attitude and activities (A) prior to becoming a judge, (B) during his campaign for judge, (C) while a judge of the Youngstown Municipal Court and (D) during his campaign for prosecuting attorney is presented by the record in this case, and such a picture is certainly pertinent to the inquiry at hand, i. e., to the degree of discipline merited by respondent’s violation.
(A)
Although there was absolutely nothing unethical about respondent’s decision, while an assistant city prosecutor, to embark upon a political career, his following testimony, on cross-examination, is highly significant in interpreting his later actions and in determining the basic motivation therefor:
“Q. Judge Franko, when did you decide to make politics your career? A. After serving, oh, I would say three or four years in the office of the prosecutor of the city of Youngstown, Ohio.
“Q. So it is fair to say, is it, that when you were campaigning for the office of municipal judge in the fall of 1953, you had set out upon a course to make politics your career? A. I would say, yes.” (Emphasis added.)
(B)
In the questioning of the respondent about a letter which he used in his campaign for prosecuting attorney (which will *28 be more thoroughly discussed later), which letter was introduced as exhibit 2 in the instant proceeding, the following testimony was adduced:
“Q. Yes. In relator’s exhibit No. 2, Judge Franko, you stated this, didn’t you: ‘I believe today that my policy of not marking driver licenses for trivial traffic offenses and of scaling fines to meet the seriousness of the offense carry out the ideals 1 promised to uphold®’ You said that, didn’t you? A. 1 did.
“Q. And the ideals to which you refer m that sentence were the ideals which you espoused vn your campaign for municipal judge in 195.H, weren't theyí A. That is correct. 1 ran on those —on that ideal.
“Q. So that it was more or less a part of your platform in the fall of 1953 when you were campaigning for municipal judge that you would not follow the provisions strictly of Revised Code Section 4507.15 with respect to marking drivers’ licenses, but you would use your discretion: isn’t that so? A. 1 interpreted this law as not being a mandatory provision and I — 1 felt 1 had the right to use my judicial discretion and I would do so; put it that way, Mr. Ranz. it# # #
“Q. All right. So that in your campaign for municipal judge in 1953 you told the voters that you interpreted that statute as being discretionary? A. The statute was never mentioned. The campaign was — the letter around January of 1953 was a very general one. * * *” (Emphasis added.)
The court can but note that the general public has a distinct aversion to being cited for and found guilty of traffic violations and to having such convictions noted on their driver licenses. With this fact and the foregoing testimony in mind, we call attention to that part of Canon 30 which states:
“A candidate for judicial position should not make • • • promises of conduct in office which appeal to the cupidity or prejudices of the appointing or electing power: he should not announce in advance his conclusions of law on disputed issues to secure class support.”
(C)
Rather than to detail the extensive testimony of respondent regarding his various actions as a judgé:óf the Youngstown Mu *29 nicipal Court of which complaint is made and which related to his use of the power and prestige of his judicial position, suffice it to say that the testimony of respondent supports the following facts:
1. The respondent, immediately upon his induction as a judge of the Youngstown Municipal Court, commenced and continued a practice of accepting pleas of guilty on traffic matters on Saturday mornings, regardless of the facts that he was not the regularly assigned traffic judge, and that Saturday was not a day upon which traffic or any other matters of the court were ordinarily heard, and in the face of and over the strenuous objections of the judge who ivas regularly assigned to hear traffic cases.
2. The respondent commenced and continued to assess, during the “self-assigned” hearings noted above and during his regularly assigned period of hearing traffic cases, a more or less standard penalty of five dollars and costs suspended for all traffic violations; he commenced and continued a policy of refusing to mark the convictions of traffic-law violators on their driver licenses; and he commenced and continued a policy of voiding duly issued parking-violation tickets, to Ihe extent of at least 720 in seven months, for no valid reason whatsoever.
3. The respondent took full advantage of the fact that the presence in Florida of a certain policeman, Sergeant William Davis, had been widely publicized by a Youngstown newspaper (the publicity strongly inferred that misfeasance or nonfeasance was involved in such presence in Florida) by issuing a subpoena for said policeman and continuing the trial of an alleged traffic law violator from hour to hour and from day to day for over two days, publicly anticipating the return of the police officer from Florida in response to the summons. The quite adequate and, we feel, anticipated newspaper coverage of these events kept respondent’s name in a prominent place throughout the episode.
Respondent’s answer to the complaints based upon the above facts was similar in nature in each instance and might be summarized as the statement, “I exercised my judicial discretion in each instance, and my exercise of such discretion cannot be questioned,”
*30 Although it is quite true that a mere mistake in the exercise of judicial discretion by a judge is not and should never be the cause or subject of a disciplinary proceeding under the Canons of Judicial Ethics prescribed by this court, we must call attention to the fact that not everything a judge does in connection with his judgship can be said to be an exercise of his “judicial discretion.”
With respect to the first fact noted above, concerning respondent’s holding of “self-assigned Saturday court,” even though he was not assigned to hear traffic cases and in the face of the objections of his fellow judge who was regularly assigned to hear such cases, we call attention to Sections 1901.15 and 1901.16, Revised Code, which read in part as follows:
Section 1901.15. “In addition to the exercise of all the powers of a municipal judge, the presiding municipal judge or chief justice has the general supervision of the business of the court and may classify and distribute among the judges the business pending in the court. * * *” (Emphasis added.)
Section 1901.16. “When a Municipal Court consists of more than one judge:
ÍÍ * # #
“(B) Any order made by the presiding judge * * * under the special powers conferred upon him may be vacated, amended, or modified by the vote of a majority of the judges of the court.
“(C) The administrative authority vested in judges constituting a Municipal Court shall be exercised by a majority vote of such judges, including the presiding judge * * (Emphasis added.)
The reason for these provisions is apparent. In any multijudge court, there is a problem of administration both as to the internal functions of the court and as to the division of duties and responsibilities of the judges thereof. Section 1901.15 simply gives the presiding judge of a multijudge Municipal Court a prima facie duty to assume the responsibility for such administration, and Section 1901.16 simply makes his acts subject to the approval of the majority of the judges of that court.
It is clear that these statutes create a “little democracy” in a multijudge Municipal Court so far as administrative matters are concerned. Administrative matters, especially with respect to a division oí the workload of a court, rarely, if ever, *31 involve the exercise of judicial discretion within the normal meaning of that term, and it is the duty of each judge of such a multijudge Municipal Court to abide by the decision of the presiding judge or the majority with respect to such matters.
As pointed out in Canon 2 of the Canons of Judicial Ethics adopted by this court, courts, generally speaking, are for litigants and not litigants for the courts. Although the independence of judicial conscience is sacrosanct in our judicial structure, the litigants of our courts have a right to expect a smooth-running operation in a multijudge court, and it is intolerable that the terms, “judicial discretion” and “judicial conscience,” should be used as excuses for one judge of a multijudge court to disrupt and throw out of gear a schedule of assignment of duties agreed upon by a majority of the judges of such a multijudge court.
We can but conclude, with respect to the issue at hand, that respondent’s persistent and continued disregard of the “order of business” for conducting the Youngstown Municipal Court, especially in the face of active objection to his so doing, did not involve any “judicial discretion” whatsoever and resulted only in creating confusion and antagonism within the court — a situation which could operate only to the detriment of the effective administration of justice to the litigants for whom that court exists.
As to respondent’s standard fine of five dollars and costs suspended for unaggravated traffic violations, as classified by him to mean those in which there was no accident or wantonness involved, as to his avowed policy of not marking driver licenses and as to his extremely benevolent attitude toward recipients of parking tickets, suffice it to say that, although this court quite possibly could not quarrel with his exercise of judicial discretion in an isolated instance, the facts set out can lead us only to the conclusion that as a general rule the exercise of his judicial discretion by respondent was not nearly so much directed to the administration of impartial justice as it was to “winning friends and influencing people” in the furtherance of his general political ambitions.
In connection with this, we call attention to that paragraph of Canon 21 of the Canons of Judicial Ethics which reads:
“In imposing sentence he [a judge] should endeavor to *32 conform to a reasonable standard of punishment and should not seek popularity or publicity either by exceptional severity or undue leniency." (Emphasis added.)
Although we must agree with respondent’s statement to the effect that everything printed in a newspaper may not be accepted as pure fact, we are forced to conclude that the Youngstown newspaper drew a highly accurate conclusion when (in the words of respondent) “they said that 1 — that my exercising of judicial discretion created a breakdown in the traffic enforcement policy of this community.”
With respect to respondent’s issuance of a summons for William Davis, the sergeant on the Youngstown police force, referred to above, the record shows that, at a time shortly prior to the arraignment of one George Chappel on a charge of reckless operation of a motor vehicle, the local newspaper had widely publicized the fact that Sergeant Davis was in Florida with his ailing wife when, as stated in the newspaper, he should have been on duty in Youngstown. Upon his appearance before respondent, Chappel pleaded not guilty, and respondent then proceeded sua sponte to issue a subpoena for Sergeant Davis, admittedly knowing that the sergeant was in Florida, allegedly to question him about certain matters of police routine. Subsequent to his issuance of such subpoena, respondent continued the Chappel hearing “four or five times,” in the words of one witness, over a period of two days, publicizing the fact that he was giving Sergeant Davis ample time to fly back to Youngstown in order to appear before him in court.
The prosecutor handling the Chappel case testified as follows with regard to this episode:
“Q. Throughout these various continuances of this Chappel hearing, isn’t it a fact that one or more of the Youngstown Vindicator police reporters were usually present? A. That is true.
“Q. And isn’t it a fact that there was a good deal of publicity about this in the Vindicator during the time of the continuances of these hearings? A. That’s true.”
Although we admit that there is nothing inherently wrong in continuing the trial of a cause from time to time in order to make available witnesses necessary to a determination of the *33 issues, Sergeant Davis was neither the arresting officer in the Chappel case nor a witness to the alleged violation. From his testimony, it seems that respondent vyislied to' question the sergeant about routine police procedure concerning the citation of persons for traffic violations when the officer issuing the citation did not actually witness the violation. It is clear that, if there was a defect in the procedure of bringing Chappel before the court, that defect could have been judicially determined as a fact without the necessity of Sergeant Davis’ presence and aside from any question of what “standard operating procedure” had been followed generally by the Youngstown police department.
We are forced to conclude that the facts regarding this episode disclose a judge more interested in obtaining personal publicity at the expense of someone else’s reputation, by capitalizing on a newsworthy issue, than one truly interested in the efficient dispensing of justice.
(D)
The actions of respondent with respect to his campaign for prosecuting attorney, which are alleged to show that he used the power and prestige of his judicial position to promote his own candidacy, are essentially threefold:
1. He assembled and had published and distributed some 85,000 copies of a four-page standard-size newspaper, entitled “The Political News,” in which he caused himself to be referred to as “Judge Franko” innumerable times.
2. He wrote letters requesting support in his campaign for prosecuting attorney to both Democrats and Republicans, addressing the former as “Dear Fellow Democrat” and the latter as “Dear Fellow Republican,” in which letters he did not hesitate to call attention to his judicial position.
To the Democrats he wrote:
‘ ‘ How many times, for instance, has the present prosecutor opened his door to Democratic Party workers? Isn’t it true that, in contrast, you know Judge Franko as a man who has been liberal and humane to the petition of all Democrats.”
And to the Republicans he wrote:
“But it’s certainly well known that as a Republican-elected judge, I have been foremost among , constructive critics of the *34 present city administration and have been waging a crusade against the racket-infested * * * gang which now controls a large segment of our county government.” That letter was signed, “Your friend and co-worker, Judge Frank R. Franko.”
It is here noted that respondent was, in fact, nominated and elected to the Youngstown Municipal Court as a Republican, but that he subsequently repudiated his Republican affiliation and declared himself to be a Democrat.
3. He wrote a letter to substantially all who appeared before him in traffic matters, calling their attention to the fact that “1 believe today that my policy of not marking driver licenses for trivial traffic offenses and of sealing fines to meet the seriousness of the offense carry out the ideals 1 promised to uphold.”
The first and second activities set out above (the “newspaper” and the letters to both Democrats and Republicans) clearly involved the use of the power and prestige of respondent’s judicial position to promote his own candidacy for a nonjudicial office. The letters to both Democrats and Republicans also raise a serious question as to whether respondent even knows the meaning of the word, “ethics,” let alone the term, “judicial ethics.” To attempt to woo support from those outside one’s own political party can hardly be called reprehensible conduct, nor can the “straddling of a political fence” be termed reprehensible, however offensive it may be to some people. However, to claim to members of both major political parties that one is a member of and sympathetic to the cause of each is not only reprehensible conduct but strongly indicates that the candidate so acting has not even a rudimentary knowledge of a,ny ethical standard whatsoever.
The wording of the letter last referred to above (the letter to those who had appeared before him in traffic matters) certainly gives meaning to respondent’s policy of not marking driver licenses, his standard fine of five dollars and costs suspended and his benevolent attitude toward recipients of parking tickets. The wording of this letter clearly supports our first conclusion that respondent’s exercise of judicial discretion was not nearly so much directed to the conscientious administration of justice as it was for the purpose of ad *35 vancing respondent’s political career, pursuant to the decision he made while an assistant city prosecutor.
It was substantially upon the facts set out herein that the Board of Commissioners on Grievances and Discipline recommended that respondent’s license as an attorney at law be suspended according to the provisions of Rule XXVII, Section 6, Rules of Practice of the Supreme Court of Ohio.
Suspension is a drastic form of discipline under the rules of this court, and we are not unaware of the difficulties attendant to reinstatement, including the repassage of the Bar examination, which make suspension almost tantamount to disbarment. It is apparent that such a severe discipline as suspension or disbarment should not lightly be imposed. Due consideration should be given to honest mistakes or misapprehensions of law.
Giving respondent the benefit of each of the above considerations, however, we can conclude only that the facts herein set out clearly indicate that respondent committed much more than a breach of Canon 30, through error in judgment or misapprehension of the law, and that his entire course of conduct both prior to and during his campaign for a nonjudicial office was in direct and unexcusable violation of the very ethical foundation upon which the admonition to resign rests. In clear terms, his decision to make a career of politics made while an assistant city attorney, his appeal to the cupidity and prejudices of the electorate in his campaign for municipal judge, his continual disruption, upon election, of the orderly administration of the business of the Youngstown Municipal Court in order to carry out his campaign promises, his blatant play for popularity in imposing extremely light sentences for traffic offenses, his abuse of the meaning of the term, “judicial discretion,” to justify these and other acts which were also incidental to the carrying out of his campaign promises, his capitalization, by the use of the power and prestige of his judicial position, on every opportunity to seek favorable newspaper publicity and the continuous reference in his campaign literature for prosecuting attorney to his lenient policies as a judge compel the conclusion that his every act subsequent to his decision to make politics his career was in furtherance of this general political ambition, and that *36 his primary consideration as a judge of the Youngstown Municipal Court was the use of the poiver and prestige of that office to further and promote his own candidacy for any office for which he might later choose to run, whether judicial or nonjudicial.
We are frank to state that had a case arisen involving a breach of Canon 30, caused solely by a misconception of the application of Fulton v. Smith, supra (99 Ohio St., 230), to Canon 30, we might well have been inclined towards leniency prior to a clarification of the issue by this court. However, the facts of the instant case clearly indicate either that respondent has little or no concept whatsoever of the ethical behavior expected and demanded of a member of the legal profession, or that, having such concept, he thinks so little of its value that he disregards it completely. Either attitude toward ethics from an attorney at law undeniably would be reprehensible — from an attorney at law who has assumed a judgship it is inexcusable. Thus, we conclude that the discipline of indefinite suspension recommended by the Board of Commissioners on Grievances and Discipline is commensurate with respondent’s violation of the Canons of Judicial Ethics.
Accordingly, respondent is suspended indefinitely, and it is ordered that his name be stricken from the Journal and the Roll of Attorneys kept and maintained by the Clerk of the Supreme Court of Ohio; that the respondent cease, desist and refrain from the practice of law in any way or form whatsoever from this day hence; and that respondent be denied each, any and all of the rights, privileges and prerogatives ordinarily accorded to a member in good standing of the legal profession of Ohio.

Report confirmed and judgment accordingly.

Weygandt, C. J., Zimmerman, Stewart, Taft, Bell and Herbert, JJ., concur.